

Priority ✓
Send
Enter
Closed
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

Link to: 35

SCANNED

FILED
CLERK, U.S. DISTRICT COURT

**NOV 23 2004**

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

NOV 23 2004

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

Cleopatra Records, Inc.,

          Plaintiff,

    v.

William Bruce Bailey et al.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. CV 04-3120 GAF (FMOx)**

**MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.

## INTRODUCTION

    This suit for declaratory relief primarily concerns whether a long defunct band of musicians – former members of which went on to achieve great fame as members of *another* band – can market its own twenty-year old sound recordings by explaining the band's historical relationship to the more famous band. In this case, members of the well-known band Guns N' Roses object to the release of an album entitled "Hollywood Rose: The Roots of Guns N' Roses."

*47*

1    Plaintiff now moves for summary judgement on its claims for declaratory and

2    injunctive relief.  Plaintiff asks the Court to declare that its reproduction and

3    distribution of the album does not violate: 1) the Copyright Act; 2) federal or state

4    trademark laws; 3) state unfair competition laws; or 4) any state right of publicity law.

5    Plaintiff also seeks an injunction preventing Defendants or any future assigns from

6    threatening or filing suit on such claims.  Further, Plaintiff seeks summary judgment

7    on Defendants' counterclaims for federal trademark infringement and false

8    designation of origin, as well as state right of publicity and unfair competition claims

9    reasoning that such claims are necessarily encompassed by the declaratory relief

10   sought.

11       Defendants assert that their counterclaims are broader than Plaintiff's suit for

12   declaratory relief in that they go beyond Plaintiff's production of the album to the

13   advertising used to promote it.  As the parties have yet to conduct discovery,

14   Defendants request that the motion be continued under Rule 56(f) in order to

15   determine whether any material questions of fact exists as to any of the claims at

16   issue in Plaintiff's motion, including their counterclaims.

17       Because the Court finds that no material questions of fact exist as to Plaintiff's

18   claims for declaratory relief, the Court **GRANTS** Plaintiff's motion for summary

19   judgment on each of these claims.  However, the Court finds that Defendants are

20   entitled to further discovery with regard to Plaintiff's use of Hollywood Rose materials

21   beyond the actual album.  The Court, therefore, **DENIES** without prejudice the motion

22   with respect to each of Defendants' counterclaims.  The Court also **DENIES** Plaintiff's

23   request for a permanent injunction.

24                                               II.

25                          **BACKGROUND**

26       For approximately nine months in the mid-1980s, Chris Weber ("Weber"),

27   Defendant William Bailey (aka "Axl Rose" or "Rose"), and Jeffrey Isbell (aka "Izzy

28   Stradlin") were members of a band called "Hollywood Rose."  (Weber Decl. ¶ 2).  They

2

1   played local clubs in Los Angeles and co-wrote songs, five of which they recorded for

2   a demo tape paid for by Weber's parents.  (Id. ¶ 3).  According to Plaintiff, Weber was

3   replaced by Saul Hudson ("Slash"), new band members were added, and after

4   performing a few more gigs as Hollywood Rose, the band changed its name to Guns

5   N' Roses ("GNR").  (Id. ¶¶ 6-7).  Fast forward twenty years and Guns N' Roses is now

6   a famous rock band that has sold tens of millions of albums and recently released a

7   "Greatest Hits" collection.  (Mercuriadis Decl. ¶¶ 2, 7).

8           In November 2003, Weber sold his rights in the Hollywood Rose sound

9   recordings, as well as related promotional materials, to Plaintiff Cleopatra Records.

10   (Perera Decl. ¶ 3).  In early 2004, Plaintiff made plans to release an album entitled

11   "Hollywood Rose: The Roots of Guns N' Roses" ("the Album"), which includes the

12   original five songs recorded for the Hollywood Rose demo tape, plus two re-mixes of

13   each of those five songs.  (Id. ¶¶ 4-5).  In preparation, Plaintiff sought and was

14   granted what the parties refer to as "mechanical licenses" for three songs used on the

15   Album that were not co-written by Weber.  (Id. ¶ 8).  The license agreement provided

16   that Defendant Guns N' Roses Music would receive royalties at the "mechanical rate"

17   on a quarterly basis.  (Compl., Ex. A).

18           However, on April 29, 2004, attorneys for Defendants sent a "cease and

19   desist" letter to Plaintiff demanding that Plaintiff stop its plans to release the Album

20   because it constituted unfair competition, copyright infringement, trademark

21   infringement, and violated Defendant Rose's right of publicity.  (Id., Ex. B).  On May

22   11th, Plaintiff also received a letter "rescinding" the mechanical licenses.  (Michel

23   Decl., Ex. C).

24           In response to these actions, Plaintiff filed the pending action seeking a

25   declaration that its reproduction and distribution of the Album would not infringe on

26   Defendants' (Axel Rose and Guns N' Roses Music's)[1] federal copyright protections,

27

28   [1] Although the Complaint also named Saul Hudson (aka "Slash") and Michael McKagan (aka
                                                                                    (continued...)

3

1   federal and state trademark protections, or their state rights of publicity and to be free

2   from unfair competition.  Plaintiff also sought and obtained mandatary compulsory

3   licenses from Defendants to replace the mechanical licenses that were revoked.

4   (Perera Supp. Decl. ¶¶ 5-6, Ex. B).

5          On June 8th, Defendants filed an answer and counterclaims for trademark

6   infringement, false designation of origin, right of publicity, and unfair business

7   practices.  That same day, Defendants also filed a motion seeking a preliminary

8   injunction, noticed for hearing on June 28, 2004.  In the mean time, however,

9   Defendants filed an emergency motion seeking a temporary restraining order ("TRO")

10  to prevent Plaintiff's planned June 22nd release of the Album.  The Court denied the

11  TRO on the grounds that Defendants had unreasonably delayed the request and did

12  not provide an adequate explanation as to why such extraordinary relief was justified.

13         With no restriction from the Court but with the suit for declaratory relief and the

14  counterclaims still pending, Plaintiff released the Album on June 22, 2004.  Two

15  weeks later the Court denied Defendants' request for a preliminary injunction finding

16  that they failed to show either likelihood of success on their counterclaims or that the

17  balance of hardships weighed in their favor.  Now before the Court is Plaintiff's motion

18  for summary judgment both on its own claims seeking declaratory and injunctive relief

19  as well as on Defendants' counterclaims.

20                                            II.

21                          **PRELIMINARY ISSUES**

22  **A. DEFENDANTS' REQUEST TO CONTINUE THE MOTION UNDER RULE 56(F)**

23         The rule governing summary judgment states that "[s]hould it appear from the

24  affidavits of a party opposing the motion that the party cannot . . . present . . . facts

25

26  [1](...continued)

27  "Duff"), two original members of GNR, as defendants, neither have appeared in this action and
    the parties agree that Rose is the only remaining partner in Guns N' Roses Music and thus the

28  only interested defendant. (Mot. at 2 n.1; Reply at 4; Counterclaim ¶¶ 4, 6).  Accordingly, these
    two defendants are dismissed pursuant to Federal Rule Civil Procedure 21.

                                             4

1   essential to justify the party's opposition, the court . . . may order a continuance to

2   permit . . . discovery . . . ." Fed. R. Civ. P. 56(f).  Thus, a court has discretion to

3   continue a motion for summary judgment where it finds that discovery is necessary for

4   a party to properly oppose it.  Program Engineering, Inc. v. Triangle Publications, Inc.,

5   634 F.2d 1188, 1193 (9th Cir. 1980).  "Generally where a party has had no previous

6   opportunity to develop evidence and the evidence is crucial to material issues in the

7   case, discovery should be allowed before the trial court rules on a motion for summary

8   judgment."  Id.

9        Defendants argue they cannot properly oppose the motion for summary

10   judgment because discovery is necessary on several claims and could not be

11   completed before the motion was filed.  Defendants request a continuance in order to

12   take the depositions of: 1) Weber, who purportedly licensed his right in the Hollywood

13   Rose materials to Cleopatra; 2) Brian Perera ("Perera"), President of Cleopatra, who

14   produced and marketed the Album; and 3) Lisa Sutton ("Sutton"), an expert witness

15   whom Cleopatra relies on to prove that it did not infringe on the GNR trademark.

16        **1.  Defendants Were Not Dilatory in Pursuing Discovery**

17        It does not appear that Defendants were dilatory in pursuing discovery.  Rule

18   26(d) does not allow discovery until after the parties have held a conference in

19   accordance to Rule 26(f).  Fed. R. Civ. P. 26(d).  The 26(f) conference in this case

20   took place on September 8, 2004.  (Michel Supp. Decl. ¶ 7).  This still allowed

21   Defendants more than a month to notice depositions before the motion for summary

22   judgment was filed.  However, Defendants claim that the parties were in settlement

23   negotiations lasting until October 11, 2004 which made depositions imprudent.  (Id. ¶

24   8).  The parties' joint scheduling conference report submitted to the Court on October

25   1, 2004 confirms that the parties were in fact in settlement negotiations at least during

26   part of that time.  (Scheduling Conference Report ¶ L).  It also anticipates all three

27   depositions Defendants now claim are necessary and proposes to leave discovery

28   open until March 28, 2005.  (Id. ¶¶ H-I).

1  **2. Discovery is Not Essential on Plaintiff's Claims for Declaratory Relief**

2       If the discovery sought by Defendants would not impact the legal analysis, the

3  Court would have no reason to delay ruling on the present motion while the parties

4  proceeded with discovery.  Here the Court concludes that the identified discovery is

5  either immaterial to the Court's analysis of the legal issues, or is unnecessary to

6  create a genuine issue of fact for trial.  Fed. R. Civ. P. 56(f).  Thus, the Court will not

7  delay ruling on the declaratory relief claims to permit discovery.

8            a. Right of Publicity and Unfair Competition

9       Defendants argue they cannot properly address Plaintiff's "right of publicity or

10  unfair competition [claims because they] stem from its claim that Rose consented to

11  the use of materials 'to promote' the band Hollywood Rose."  (Opp. at 7).  Defendants

12  argue that Weber's deposition is necessary in order to "test the credibility and

13  evidentiary support for Weber's position" that Rose consented.  (Id.).

14       While consent is an element of a right of publicity claim, Defendants have

15  already offered evidence to show that Rose did not give consent to use his name,

16  voice, or photos in the Album.  (Rose Supp. Decl. ¶ 4).  Thus, if the Court were being

17  asked only to determine whether a genuine issue of material fact remains for trial on

18  the question of consent, the motion would be denied.  But the "public interest"

19  exception contained in Cal. Civ. Code § 3344(d) permits the use of one's name and

20  image where there is a "public interest" in the work containing the name and image.

21  The substantive analysis below explains why the Album at issue in this case falls

22  within the statutory "public interest" exception, which in turn demonstrates that the

23  issue of consent is immaterial to the resolution of this motion.  Thus, the Court need

24  not permit discovery on the consent question to rule on the pending motion.[2]

25

26

27  [2] As California's unfair competition law has no separate consent element, it seems that
    Defendants are asserting it as tied to the right of publicity claim in this instance and the request
28  for discovery thereby fails for the same reason.

### b.  Copyright

Defendants assert that opposition to Plaintiff's copyright claims also require Weber's deposition because it is necessary to discern "his supposed authorship of the materials, the limits of his involvement in the creation of the materials, and the restrictions imposed on Weber's rights in connection with the materials." (Opp. at 7). While some of Plaintiff's copyright infringement issues do turn on Weber's assertion of joint ownership, Defendant Rose is undisputedly also a joint owner and could, therefore, offer testimony creating a material question of fact on this issue if there was one.   The fact that Defendant Rose has submitted a declaration without challenging Plaintiff's participation in the authorship of those compositions convinces the Court that no such evidence exists.   Thus, nothing would be gained by delaying this motion while Defendants took Weber's deposition.   "[N]either a desire to cross examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment." Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983).

### c.  Trademark

Finally, Defendants claim that they cannot properly oppose Plaintiff's motion for summary judgment on the trademark claims without discovery.  Here Defendants claim that the Perera deposition is necessary because they have reason to believe that Plaintiff is engaging in marketing and licensing of Hollywood Rose materials other than the Album and consequently they need "to discover the other uses of the trademark and trade name by Cleopatra in selling and or/licensing the materials." (Opp. at 7).  However, Plaintiff's suit for declaratory relief is only with regard to the reproduction and distribution of the Album and not any sub-licensing agreements or other uses in which Plaintiff make of the protected marks.

At oral argument, Defendants also asserted that Sutton's deposition was necessary to test her opinions that Plaintiff used only so much of Defendants' trademark as necessary and that the use did not suggest endorsement, two vital

1  prongs of the nominative fair use defense for trademark infringement asserted by

2  Plaintiff and discussed in detail below.  The Court finds this argument unpersuasive.

3  Whether or not the Album is entitled to a nominative fair use defense can be

4  determined by an examination of the Album itself and thus Sutton's opinions are not

5  "essential" to either proving or opposing these claims.

6         **C.  Limited Discovery is Necessary on Defendants' Counterclaims**

7         However, while discovery is not essential to oppose Plaintiff's claims for

8  declaratory relief with regard to the reproduction and distribution of the Album,

9  Defendants are entitled to further discovery on their counterclaims, which are

10  potentially broader than the issues raised in the declaratory relief action.  For

11  example, in addition to the allegedly infringing behavior related to Plaintiff's claims for

12  declaratory relief, Defendants assert that Plaintiff has participated in advertising for

13  the Album, the release of live performances, and "merchandising" constituting

14  trademark, unfair competition and right of publicity violations.  (Counterclaim ¶¶ 15,

15  22, 28, 34).  Almost no evidence has been presented to the Court on these allegedly

16  infringing uses and certainly not enough to determine whether summary judgment is

17  proper.

18         Accordingly, the Court **DENIES** the motion with respect to the counter-claims,

19  but without prejudice to the renewal of that motion upon the completion of discovery

20  relevant to these issues.

21                        **III.**

22              **SUBSTANTIVE ISSUES**

23  **A. Legal Standard for Declaratory Judgment Jurisdiction**

24         The Declaratory Judgment Act provides that federal courts may "declare the

25  rights and other legal relations" of parties in "a case of actual controversy."  28 U.S.C.

26  § 2201.  "If both a federal question and an actual controversy exist, then declaratory

27  judgment jurisdiction may appropriately be exercised."  Starter Corp. v. Converse,

28  Inc., 84 F.3d 592, 595 (2d Cir. 1996).  In intellectual property disputes, an actual

1   controversy exists where (1) defendant's conduct creates a real and reasonable

2   apprehension of liability on the part of the plaintiff, and (2) plaintiff engaged in a

3   course of conduct which has brought it into adversarial conflict with the Defendants.

4   Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1555 -1556

5   (9th Cir. 1990) (copyright cases); Societe de Conditionnement v. Hunter Engineering

6   Co., 655 F.2d 938, 943 (9th Cir.1981) (patent cases); Starter Corp. v. Converse, Inc.,

7   84 F.3d 592, 595 (2d Cir. 1996) (trademark cases).

8         In the case at bar, Plaintiff seeks relief under federal copyright and trademark

9   laws and thus a federal question exists.  In addition, Plaintiff's conduct of planning and

10  then releasing the Album created a real and reasonable apprehension of liability

11  because Defendants had threatened suit for such conduct and in fact brought

12  counterclaims in response to Plaintiff's suit.  (See Compl. Ex. B).  Accordingly, the

13  Court has jurisdiction over this case.

14  **B. LEGAL STANDARD FOR SUMMARY JUDGMENT**

15        Summary judgment is proper where "the pleadings, depositions, answers to

16  interrogatories, and admissions on file, together with the affidavits, if any, show that

17  there is no genuine issue as to any material fact and that the moving party is entitled

18  to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, when addressing a

19  motion for summary judgment, this Court must decide whether there exist "any

20  genuine factual issues that properly can be resolved only by a finder of fact because

21  they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby,

22  Inc., 477 U.S. 242, 250 (1986).

23        The moving party has the burden of demonstrating the absence of a genuine

24  issue of fact for trial.  See id. at 256.  The nonmoving party's evidence enjoys a

25  presumption of veracity, and all inferences drawn from the evidence must be viewed

26  in the light most favorable to the nonmoving party.  See Eastman Kodak Co. v. Image

27  Tech. Servs., Inc., 504 U.S. 451, 456 (1992); Anderson, 477 U.S. at 255.  However, "a

28  mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion

1    for summary judgment; rather, the nonmoving party must introduce some 'significant

2    probative evidence tending to support the claim.'" <u>Summers v. Teichert & Son, Inc.</u>,

3    127 F.3d 1150, 1152 (9th Cir. 1997) (<u>quoting</u> <u>Anderson</u>, 477 U.S. at 252, 249);

4    <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288 (9th Cir. 1987) (holding that

5    summary judgment may be granted if "the evidence is merely colorable . . . or is not

6    significantly probative"). And where there is no evidence demonstrating the existence

7    of a genuine issue of material fact, the moving party may prevail simply by "pointing

8    out to the district court . . . that there is an absence of evidence to support the

9    nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

10    **C. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS COPYRIGHT ACT ASSERTIONS**

11         Plaintiff seeks declaratory relief that the written compositions, recordings and

12    photographs used in the reproduction and distribution of the Album do not violate

13    Defendants' protected copyrights.[3]

14         **1. Musical Compositions**

15         A co-author of a work is a joint owner under copyright law. 17 U.S.C. §

16    201(a). "A co-owner of a copyright cannot be liable to another co-owner for

17    infringement of the copyright . . . . Rather, each co-owner has an independent right to

18    use or license the use of the copyright." <u>Oddo v. Ries</u>, 743 F.2d 630, 632-33 (9th Cir.

19    1984). In addition, the Copyright Act, 17 U.S.C. § 115(a)(1) states that "[w]hen

20    phonorecords of a nondramatic musical work have been distributed to the public . . .

21    any other person . . . may, by complying with the provisions of this section, obtain a

22    compulsory license to make and distribute phonorecords of the work." The section

23    requires that a potential licensee give notice of his or her intent to obtain a license and

24    pay royalties after it is obtained. 17 U.S.C. § 115(b)-(c).

25

26    [3] Plaintiff asserts that because Defendants did not allege copyright infringement as part of their

counterclaims and because such claims are compulsory as arising out of the same transaction

27    or occurrence, they are estopped from asserting violations of such and the Court should not

consider their arguments. However, even where Defendants would be precluded from claiming

28    that Plaintiff engaged in copyright infringement, the Court will consider evidence concerning the

lawfulness of Plaintiff's use of the materials in assessing a request for declaratory relief.

1    The Album contains five songs originally recorded by Hollywood Rose, "Killing

2    Time," "Rocker," "Anything Goes," "Reckless Life," and "Shadow of Your Love" plus

3    two remixes of each of these songs. (Cohen Decl., Ex. C ). Plaintiff has obtained

4    compulsory licenses and paid royalties for the last three of these songs, as well as

5    their remixes. (Perera Supp. Decl. ¶¶ 5-6, Ex. B-C).[4] Accordingly, use of these songs

6    on the Album does not infringe on Defendants' copyright interests. Plaintiff also

7    submits declaration testimony to show that Weber is a co-author of the other two

8    songs, "Rocker" and "Killing Time," and that Weber transferred of all his interests in

9    these works to Plaintiff. (Weber Decl. ¶ 10; Perera Supp. Decl. ¶ 4; Cohen Decl. ¶ 7).

10    Defendants offer no evidence to dispute this testimony.[5] Instead, Defendants

11    claim that they cannot determine the truthfulness of Weber's assertion that he is a co-

12    author of the works without deposition testimony. However, as noted above, "neither

13    a desire to cross examine an affiant nor an unspecified hope of undermining his or her

14    credibility suffices to avert summary judgment." Nat'l Union Fire Ins. Co. v. Argonaut

15    Ins. co., 701 F.2d 95, 97 (9th Cir. 1983).

16    Defendants also assert that even if Plaintiff is a joint copyright owner by virtue

17    of Weber's co-authorship, it is not allowed to use that copyright in a destructive

18    manner and that "broad use by an active publisher can so far exhaust the popularity of

19

20    [4] Plaintiff's evidence on authorship of "Anything Goes" and "Reckless Life," appears
21    contradictory. While Weber claims to be a co-author of the songs (Weber Decl. ¶ 10), Plaintiff
      states in another declaration that "in early April, Cleopatra ventured to get mechanical licenses
22    for the three songs on the Album which were **not** written at least in part by Weber." (Perera
      Decl. ¶ 8) (emphasis added). In addition, GNR owns copyrights in these two songs which do
23    not include Weber as an author. (Compl., Ex. A). Regardless, because Plaintiff used these
      works pursuant to a compulsory license agreement and has paid royalties, it has not violated
24    Defendants' copyright interests.

25    [5] Defendants merely assert that Weber has no ownership interest in one of the songs (Shadow
      of Your Love) and that there is a dispute over Plaintiff's mechanical licenses. (Opp. at 8). Both
26    of these points are irrelevant. While there was a dispute over whether or not Defendants could
      revoke the mechanical, or consensual licenses, it granted to Plaintiff for the three songs
27    "Shadow of Your Love," "Anything Goes" and "Reckless Life," Plaintiff obtained compulsory
      licenses for these works and thus has unquestionably not infringed on Defendants' copyrights.
28    (Reply at 5 n.2).

1    a song . . . as to destroy its value after that use has ended." <u>Shapiro, Bernstein, & Co.</u>

2    <u>v. Jerry Vogel Music. Co.</u>, 73 F. Supp. 165, 168 (S.D.N.Y. 1947).  Defendants claim

3    that they need discovery to determine whether Plaintiff's use has destroyed the joint

4    work.

5        Here Defendants grasp at straws.  <u>Shapiro</u> finds little support, enthusiastic or

6    otherwise, in the copyright jurisprudence that has developed in the nearly six decades

7    since publication of the decision.  The leading commentator in the field, who has

8    expressed his own skepticism on the point, notes that the question of whether a joint

9    copyright owner could actually use intangible property to the point of destruction

10   "remains to be finally settled." 1 Melville B. Nimmer and David Nimmer, <u>Nimmer on</u>

11   <u>Copyright</u> § 6.10[A] (2003).  <u>Nimmer on Copyright</u> opines that

12           Generally if a work has been licensed and exploited in a given

13           medium, this hardly destroys the copyright in that it may still have

14           value in other media, and indeed may still have value for competitive

15           uses in the same medium.  For instance, in the phonograph record

16           business, it is customary to acquire nonexclusive rights while

17           competitive companies produce records based upon the same work.

18   <u>Id.</u>

19       This Court agrees with <u>Nimmer</u> and takes note that multiple versions of the

20   same written composition are frequently released.  <u>See e.g.</u>, Credence Clearwater

21   Revival, <u>Proud Mary</u> (Fantasy 1969); Ike and Tina Turner, <u>Proud Mary</u> (Liberty 1971);

22   Leonard Nemoy, <u>Proud Mary</u> (Rhino Records 1988); <u>see also</u> Richard Berry & the

23   Pharaohs, <u>Louie Louie</u> (Flip Records 1956); Paul Revere & the Night Raiders, <u>Louie</u>

24   <u>Louie</u> (Columbia 1963); John Belushi, <u>Louie Louie</u> (MCA 1978); Fat Boys, <u>Louie Louie</u>

25   (Tin Pan Apple 1988); and Lynyrd Skynyrd, <u>Freebird</u> (MCA 1973); Phish, <u>Freebird</u>

26   (Elektra 2002); Charlie Daniels Band, <u>Freebird</u> (Koch Records 2004).

27       As to the notion that the repeated playing of a song destroys its value, the

28   Recording Industry Association of America reported that Elvis Presley's recordings

1   topped 100 million in sales in 2002, and by January 2004 had reached in excess of

2   117 million copies.  In 2000, the Beatles had sold approximately 113 million copies of

3   their various records; by 2004 sales of those records totaled 166.5 million copies.

4   These figures are for their records only, and do not reflect the numbers of sales of

5   their songs performed by other artists.  Experience belies the claim that repeated use

6   of a musical composition destroys its value as hypothesized in <u>Shapiro</u>.  Indeed, it is

7   more likely that the release of the Hollywood Rose album will engender increased

8   interest in GNR and its members as more information about the band and its history

9   becomes a part of the public record.  For these reasons, the Court concludes that

10  <u>Shapiro</u> provides no basis for finding that Plaintiff has infringed on Defendants'

11  copyright.

12          **2.  Photos and Sound Recordings**

13          The Album also uses original sound recordings from a Hollywood Rose studio

14  session and the cover and insert contain several photographs of the members of the

15  band as they appeared around the time of the original recordings.  (Perera Decl. ¶¶ 4-

16  5; Weber Decl. ¶ 5).  Plaintiff submits declaration testimony stating that Weber was a

17  co-author of the sound recordings and co-owner of the photographs.  (Weber Decl. ¶

18  4-5).  Plaintiff also offers testimony to show that the original sounds recordings were

19  wholly financed by Weber's family and that a representative of GNR previously

20  attempted to buy the masters from Weber.  (<u>Id.</u> ¶¶ 4, 8).

21          Defendants offer no evidence to the contrary and state nothing more than the

22  arguments already addressed under the written composition section.  Accordingly,

23  Plaintiff is entitled to summary judgment on these claims.

24  **D.  Plaintiff is Entitled to Summary Judgment on Its Federal and State**

25  **Trademark Assertions**

26          Plaintiff also seeks declaratory relief that its use of the phrase "guns and

27  roses" in the title and packaging of the Album does not violate federal (the Lanham

28  Act) or state (statutory or common law) trademark laws.

### 1.  The Legal Standards

To constitute a trademark violation under either the Lanham Act, California statutory law, or California common law, a party must use in commerce a reproduction or copy of a registered trademark without consent of the owner in connection with the sale or advertising of any goods or services, and such use must be likely to cause confusion, mistake, or deceive customers.  15 U.S.C. § 1114(a); Cal. Bus. & Prof. Code § 14335(a) ("Any person who uses or unlawfully infringes upon a mark registered under this chapter or under Title 15 of the United States Code . . . shall be subject to an injunction against that use by the owner of the mark"); Perfect 10, Inc. v. CCbill, LLC, 2004 WL 1798295 at *24 (C.D. Cal. June 22, 2004) ("California's wrongful use of registered mark law . . . provides the same type of relief as the federal trademark laws under the Lanham Act, namely, protection for trademarks"); Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 791 (9th Cir. 1981) (stating that to prevail on a claim of trademark infringement under the common law of California, a party must establish there was confusion about the source or sponsorship of the mark because "[w]ithout likelihood of confusion there is no infringement under the California common law of trademarks.").

To constitute unlawful false designation of origin under the Lanham Act a party must use in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the party with the owner, or as to the origin, sponsorship, or approval of his goods by the owner.  15 U.S.C. § 1125(a)(1)(A).

### 2.  Nominative Fair Use as a Defense

Weber concedes that Defendants own the rights to the trademark "Guns N' Roses" as related to performances by a musical group and prerecorded audio tapes, phonograph records and compact discs.  (Mercuriadis Decl. ¶ 4).  Weber also

1   acknowledges that Defendants' protected mark appears on the packaging for the

2   Album.  However, Plaintiff argues that its use of the mark does not violate the above

3   laws because it constitutes nominative fair use.

4         A "nominative fair use analysis is appropriate where a [party] has used the

5   [owner's] mark to describe the [owner's] product, even if the [party's] ultimate goal is

6   to describe his own product." Cairns v. Franklin Mint Co., 292 F.3d 1139, 1151 (9th

7   Cir. 2002).  Here, Cleopatra is using Defendants' mark (Guns N' Roses) to identify

8   Defendants' own product (the band Guns N' Roses) for the purpose of describing its

9   own product (recordings by the band Hollywood Rose).  Because the use "is grounded

10  in [Cleopatra's] desire to refer to [Guns N' Roses's] product as a point of reference for

11  [Cleopatra's] own work," the nominative fair use analysis is appropriate.  Mattel, Inc. v.

12  Walking Mountain Prods., 353 F.3d 792, 810 (9th Cir. 2003).  This analysis applies to

13  state as well as federal claims of trademark infringement and false designation of

14  origin.  New Kids on the Block v. New Am. Publ'g, 971 F.2d 302, 305, 309 (9th Cir.

15  1992) (affirming summary judgment on a fair use defense for seven causes of action

16  including both California and federal claims for trademark infringement, false

17  advertising, and unfair competition).

18             **a.  _New Kids_ and Its Progeny**

19        In New Kids, the Ninth Circuit explained that when a case involves a "non-

20  trademark" or "nominative" use of a mark, "the infringement laws simply do not apply."

21  Id. at 397.  The New Kids nominative fair use defense acknowledges that "it is often

22  virtually impossible to refer to a particular product for purposes of comparison,

23  criticism, point of reference or any other such purpose without using the mark." Id. at

24  306.  The court laid out a three-prong test for a nominative fair use defense:

25             First, the product or service in question must be one not readily

26             identifiable without use of the trademark; second, only so much of the

27             mark or marks may be used as is reasonably necessary to identify the

28             product or service; and third, the user must do nothing that would, in

15

1    conjunction with the mark, suggest sponsorship or endorsement by the

2    trademark holder.

3    Id. at 308.

4        In New Kids, the defendant newspaper used the plaintiffs' trademark in a poll

5    asking readers to vote for their favorite "New Kid."  The court found that the defendant

6    was using the mark to "refer to the New Kids themselves," thus the nominative, rather

7    than the classic, fair use test applied.  Under that test, the court held that there was no

8    way the defendant could reasonably refer to the New Kids without using the

9    trademark, that the use was limited to that reasonably necessary to identify the New

10   Kids, and the defendant did not use the mark in such a way as to imply sponsorship

11   by the New Kids.  For these reasons, the court found that the use was permissible.

12   Id. at 308-09.

13       Since New Kids, the Ninth Circuit has applied the nominative fair use test in a

14   number of different circumstances.  See, e.g., Mattel, Inc. v. Walking Mountain Prods.,

15   353 F.3d 792, 810 (9th Cir. 2003) (finding that an artist's use of plaintiff's trademarked

16   "Barbie figure and head in his works to conjure up associations of Mattel, while at the

17   same time to identify his own work, which is a criticism and parody of Barbie" was

18   nominative); Cairns v. Franklin Mint Co., 292 F.3d 1139, 1155 (9th Cir. 2002) (finding

19   that a defendant's use of the name and likeness of Princess Diana to describe its

20   Princess Diana commemorative products was nominative); Playboy Enters., Inc. v.

21   Welles, 279 F.3d 796, 803-04 (9th Cir. 2002) (finding that a defendant's use of the

22   trademarked title "Playboy Playmate of the Year 1981" to identify herself in headlines

23   and banner advertisements on her website was nominative); cf. Abdul-Jabbar v. Gen.

24   Motors Corp., 85 F.3d 407, 412-13 (9th Cir. 1996) (reversing summary judgment on

25   third prong of test where comparison of qualities of athlete to attributes of vehicle

26   created issue of fact regarding the suggestion that athlete was endorsing the product).

27       **b.  Plaintiff Has a Nominative Fair Use Defense Under _New Kids_**

28

1          1. Plaintiff's Product is Not Readily Identifiable Without Use of

2                                     the Mark

3          Plaintiff argues that its use satisfies the first prong because the only alternative

4   to it saying "The Roots of Guns N' Roses" is to engage in complicated linguistics such

5   as "The Roots of the Popular Rock Band on Geffen Records that Sold Millions of

6   Albums and Sang the Hit Song 'Welcome to the Jungle.'" (Mot. at 11).  Plaintiff

7   contends, therefore, that it uses the mark "Guns N' Roses" merely to refer to the band

8   Guns N' Roses for the purpose of describing its own product.  Since Hollywood Rose

9   bears a significant, and indisputable, historical connection to GNR, the reference to

10  GNR is necessary if the significance of Plaintiff's product is to be readily identifiable.

11  New Kids, at 308.  This is a typical nominative fair use situation and, as such, satisfies

12  the first prong.  Cairns, 292 F.3d at 1151 n.8 ("Only rarely, if ever, will a defendant

13  choose to refer to the plaintiff's product unless that reference ultimately helps to

14  describe the defendant's own product.").

15                  2. Plaintiff Used Only So Much of The Mark as Was Necessary

16         The second prong of the nominative fair use test considers whether only so

17  much of the mark is used as is "reasonably necessary" to identify the product.  New

18  Kids, 971 F.2d at 308.  The second prong focuses on the identification of the

19  *trademark owner's* product, and requires the Court to consider whether the mark

20  was used only to the extent necessary to make that identification.[6]  Cairns, 292 F.3d

21  at 1153.  Here, the only portion of the mark Plaintiff uses are the actual words "guns n'

22  roses."  Defendants acknowledge that neither the typeface nor the logos used on the

23  Hollywood Rose Album resemble those used on Guns N' Roses albums.  See New

24  Kids, 971 F.2d at 308 n.7 (explaining the second prong by stating that "a soft drink

25  competitor would be entitled to compare its product to Coca-Cola or Coke, but would

26

27  _____

28  [6] In other words, the question is not whether Cleopatra's use of the mark is "reasonably
    necessary" to identify Cleopatra's product, but rather whether the use is reasonably necessary
    to identify Defendants' product, the band Guns N' Roses.

1   not be entitled to use Coca-Cola's distinctive lettering); <u>Volkswagenwerk</u>

2   <u>Aktiengesellschaft v. Church</u>, 411 F.2d 350, 352 (9th Cir.1969) (discussing that the

3   defendant "did not use Volkswagen's distinctive lettering style or color scheme, nor did

4   he display the encircled 'VW' emblem").   Thus, there is no claim that Plaintiff has

5   attempted to use any distinctive lettering, logo, symbol or the like on the cover of its

6   album.

7         Although Plaintiff could describe its product without any reference at all to

8   Guns N' Roses, recordings by the little-known and short-lived band "Hollywood Rose"

9   have little meaning without the additional information that the recordings have a

10   historical relationship to the famous band Guns N' Roses.   Thus, the situation closely

11   resembles that in <u>Playboy</u>, where Terri Welles description of herself as a nude model

12   would have had little meaning without her identification as a former Playmate of the

13   Year.   Likewise, the case is similar to that in <u>Brother Records, Inc. v. Jardine</u>, 318

14   F.3d 900 (9th Cir. 2003), where a founding member of the Beach Boys, whose own

15   name is not readily recognized, described his connection to the Beach Boys by calling

16   his new band "The Beach Boys Family and Friends."   In both of those cases, the court

17   found that the plaintiff's use of the trademark satisfied the second prong because the

18   alleged infringer used only the protected name without any distinctive fonts, logo or

19   lettering.   <u>Playboy</u>, 279 F.3d at 802; <u>Brother Records</u>, 318 F.3d at 908.   These cases

20   control the analysis here.   Plaintiff only used as much of the mark that is reasonably

21   necessary to identify Guns N' Roses, i.e., the words themselves.   Such minimal use is

22   reasonable and satisfies the second prong.

23                  <u>3.  Plaintiff Has Done Nothing to Suggest Sponsorship or</u>

24                  <u>Endorsement By Defendants</u>

25         The final question in determining whether the use is a nominative fair use is

26   whether Plaintiff did anything "that would, in conjunction with the mark, suggest

27   sponsorship or endorsement by [Guns N' Roses]." <u>New Kids</u>, 971 F.2d at 308.   This

28   prong is key because "the nominative fair use defense is available only if 'the use of

1   the trademark does not attempt to capitalize on consumer confusion or to appropriate

2   the cachet of one product for a different one.'" Brother Records, 318 F.3d at 908

3   (quoting New Kids, 971 F.2d at 307-08).

4         Here, the front of the Album includes the words "the roots of guns n' roses," in

5   all lowercase letters in plain type one-quarter of the size of that used to identify

6   "Hollywood Rose." (Cohen Decl., Ex. C). The spine also maintains a significant size

7   difference and clearly displays the Hollywood Rose name more prominently than the

8   words "guns n' roses." (Id.). These facts weigh heavily in Plaintiff's favor. See

9   Brother Records, 318 F.3d at 908 (finding that a party's use of the protected mark on

10  an album failed the third prong where it was displayed more prominently than the rest

11  of the title); see also Rostropovich v. Koch Int'l Corp., 34 U.S.P.Q.2d 1609, 1612

12  (S.D.N.Y. 1995) (finding likelihood of confusion as to endorsement in an infringement

13  analysis where the user prominently displayed the owner's mark in large print).

14        In addition, use of the words "guns and roses" in the title, by itself, is not

15  enough to suggest endorsement. The Ninth Circuit has recognized that while

16  consumers expect a title to communicate a message about the product, "they do not

17  expect it to identify the publisher or producer." Mattel, Inc. v. MCA Records, Inc., 296

18  F.3d 894, 902 (9th 2002). In Mattel, the court held that "literary titles do not violate the

19  Lanham Act 'unless the title has no artistic relevance to the underlying work

20  whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as

21  to the source or the content of the work.'" Id. (citing Rogers v. Grimaldi, 875 F.2d 994,

22  999 (2d Cir. 1989)). Here, the title of the Album has artistic relevance because it

23  describes the historical context of the underlying recordings and it is clear that the

24  recordings are by Hollywood Rose, which is "the roots of" Guns N' Roses and not the

25  band itself.

26        Moreover, the pictures used in the Album do not suggest Defendants'

27  sponsorship or endorsement. The pictures are all of the band Hollywood Rose as

28  they appeared at the time of the recordings (Weber Decl. ¶ 5) and do not try to trick

1    consumers by matching current pictures of GNR with Hollywood Rose recordings.

2    See Benson v. Paul Winley Record Sales Corp., 452 F. Supp. 516, 518 (S.D.N.Y.

3    1978) (finding likelihood of confusion as to endorsement in an infringement analysis

4    where the album matched a current picture of a recently famous artist with his pre-

5    fame recordings); CBS, Inc. v. Springboard Int'l Records, 429 F. Supp. 563, 569

6    (S.D.N.Y. 1977) (same).

7         Finally, the packaging includes very detailed historical information on the back

8    cover, which puts the Album into context and clearly identifies the music as that of

9    Hollywood Rose, a "pre-GN'R band." (Cohen Decl., Ex. C).  The back cover also

10   states that the songs are performed by "AXL Rose, Izzy Stradlin, Chris Weber and

11   Johnny Kreis.  Recorded January 1984 in Hollywood, California." (Id.).  In addition,

12   the disc insert includes a detailed explanation of the history behind the recordings

13   under the title "The Hollywood Rose Story." (Id.).  In the following four pages of text,

14   the name "Guns N' Roses" does not even appear until the final sentences of the last

15   page, where the author describes the end of Hollywood Rose and the birth of Guns N'

16   Roses stating, "That's where the Guns N' Roses story really begins. . . ." (Id.).

17        This detailed background information, which clearly indicates the source and

18   year of the recordings also weighs heavily in Plaintiff's favor.  See Springboard, 429 F.

19   Supp. at 569 (finding likelihood of confusion as to endorsement in an infringement

20   analysis where the album did not even contain the year of the recordings); Benson,

21   452 F. Supp. at 518 (finding likelihood of confusion as to endorsement in an

22   infringement analysis where the party promoted the old recordings as "new" material).

23        Defendants argue that "the issue of likelihood of confusion (the third prong of

24   the nominative fair use test) is a question for a jury." (Opp. at 10).  Yet neither case,

25   White nor Abdul Jabar, relied on by Defendants supports this assertion.  See White v.

26   Samsung Elec. Am., Inc., 971 F.2d 1395, 1400 (9th Cir. 1992); Abdul-Jabbar, 85 F.3d

27   at 413.  Both of these cases involved the unauthorized use of a defendant's likeness

28   in television ads.  White involved a likelihood of confusion not a nominative fair use

1  analysis. White, 971 F.2d 1395.  Even still, the White court found only **after**

2  completing analysis on the eight-factor test, that the question of likelihood of confusion

3  could go either way and thus a material question existed for the jury. Id. at 1400.  The

4  Court stated that "we stress that we reach this conclusion in light of the peculiar facts

5  of this case." Id.

6          Similarly, in Abdul Jabar, in analyzing the third prong of the nominative fair use

7  test, the Court found that "[m]any people may assume that when a celebrity's name is

8  used in a television commercial, the celebrity endorses the product advertised.

9  Likelihood of confusion as to endorsement is therefore a question for the jury." Abdul-

10  Jabbar, at 413.  The Court found this to be true because of the unique nature of

11  celebrity endorsement in television advertising. Id. ("celebrity endorsements in

12  television commercials is so well established by commercial custom that a jury might

13  find an implied endorsement.").

14          This unique situation is not present in this case and thus the Court is free to

15  determine as a matter of law that Plaintiff has done nothing to suggest sponsorship or

16  endorsement by Defendants. See New Kids, 971 F.2d at 309 (affirming summary

17  judgment and finding that the defendants did not violate trademark law because they

18  were entitled to a fair use defense).  Accordingly, the Court finds that Plaintiff has also

19  satisfied the third prong of the New Kids test and is therefore entitled to a nominative

20  fair use defense against any federal or state claims of trademark infringement or false

21  designation of origin.

22  **E.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS UNFAIR COMPETITION**

23  **ASSERTIONS**

24          Plaintiff is entitled to summary judgment on the unfair competition claims to

25  the same extent as the trademark claims.  California Business and Professions Code

26  § 17200, as well as the common law, prohibits "unfair" business practices which

27  include "any unlawful, unfair or fraudulent business act or practice and unfair,

28  deceptive, untrue or misleading advertising."  Plaintiff briefs this claim in the same

1   section as its trademark claims and offers no arguments for declaratory relief on this

2   point other than those submitted for trademark. (Mot. at 8-9). Although actions for

3   unfair competition can encompass more than just trademark infringement, where they

4   are presented together, the determination on the unfair competition claim is the same

5   as that for trademark. See Denbicare U.S.A. v. Toys "R" Us, Inc., 84 F.3d 1143, 1152

6   (9th Cir. 1996) ("State common law claims of unfair competition and actions pursuant

7   to California Business and Professions Code § 17200 are 'substantially congruent' to

8   claims made under the Lanham Act.") (citations omitted); New Kids on the Block v.

9   New Am. Publ'g, 971 F.2d 302, 305, 309 (9th Cir. 1992) (finding that the nominative

10  fair use defense applied for claims of trademark infringement as well as for a

11  California unfair competition claim where the same conduct was asserted for both);

12  Ives Labs. Inc. v. Nature's Own Labs., 529 F. Supp. 347, 349-50 (C.D. Cal. 1981)

13  (finding that the plaintiff's trademark infringement claims also established violations of

14  California's unfair competition law).

15  **F. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS RIGHT OF PUBLICITY**

16  **ASSERTIONS**

17      Plaintiff also seeks declaratory relief stating that use of Defendant Rose's

18  name, voice and likeness on the Album does not violate his right of publicity under

19  California statutory or common law.  To violate another's common law right to publicity

20  a party must (1) use another's identity; (2) appropriate another's name or likeness for

21  his own advantage, commercial or otherwise; (3) without consent; and (4) cause that

22  person injury.  Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001).

23  In addition, California Civil Code § 3344 provides a statutory right of publicity cause of

24  action requiring the same elements as the common law plus "knowing use by the

25  defendants as well as a direct connection between the alleged use and the

26  commercial purpose." Id. at 1001.

27

28

1    Plaintiff does not dispute that the Album uses Rose's name or likeness

2    (pictures and voice) but argues that he consented to these uses.  In the alternative,

3    Plaintiff asserts that consent is not needed because the use of Rose's name and

4    likeness falls within the common law and statutory exception to the right of publicity

5    regarding matters of public interest and free expression .

6    **1. Consent**

7        Plaintiff offers evidence to show that twenty years ago every member of

8    Hollywood Rose gave consent to use the recordings and photos "to promote the

9    band" (Weber Decl. ¶¶ 4-5) and argues that this consent is still valid because the

10   Album does nothing more than promote the band Hollywood Rose.[7]  Defendants now

11   offer evidence directly contrary to Weber's statement asserting that "it was the

12   understanding and agreement of the members of the band Hollywood Rose that those

13   recording and [photos] would only be used – as jointly agreed – while the band was in

14   existence."  (Rose Supp. Decl. ¶ 4).  Thus, a question of fact exists on the question of

15   consent.

16   **2. Public Interest Defense to the Right of Publicity**

17

18       California law recognizes an exception to the right of publicity where there is a

19   public interest in the subject matter of the published material.

20       a.  Consent is Not Required to Publish Matters of Public Interest

21       Consent is irrelevant where, as here, a party has a public interest defense to

22   its use of another's name or likeness.  California Civil Code Section 3344(a) provides

23   a right of publicity cause of action where any person "knowingly uses another's name,

24

25   _____

26   [7] Defendants object to Plaintiff's testimony regarding consent as hearsay.  The Court overrules this objection on at least two grounds.  First, statements of agreement or consent have independent legal significance and are not "assertions" within the meaning of the hearsay rule.

27   See Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.11[3] (2d ed. 2003).  Second, even if they were hearsay, Defendants' statements may be used by Plaintiff as party admissions under Federal Rule of Evidence Rule 801(d)(2)(A).

28

1   voice, signature, photograph, or likeness, in any manner, on or in products,

2   merchandise, or goods . . . **without such person's prior consent**." (emphasis

3   added). Yet, § 3344(d) provides that when an individual's likeness is used for a work

4   deemed to be in the public interest, it "shall **not constitute a use for which consent**

5   **is required** under subdivision (a)." (emphasis added).  This defense is also available

6   where a party asserts his common law right of publicity.  Montana v. San Jose

7   Mercury News, Inc., 34 Cal. App. 4th 790, 793 (1995) ("Like the common law cause of

8   action, the statutory cause of action specifically exempts from liability the use of a

9   name or likeness in connection with the reporting of a matter in the public interest.").

10  The question, therefore, is whether the Album constitutes a matter of public interest

11  that would defeat a claim of lack of consent.

b.  Plaintiff has a Valid Public Interest Defense

13          There are two seminal cases discussing the public interest defense to a right

14  of publicity claim.  As this right is provided by state law, both cases come from the

15  California Court of Appeal.  In the first case, Dora v. Frontline Video, 15 Cal. App. 4th

16  536, 543 (1993), the plaintiff, a renowned Malibu surfer, brought suit for both common

17  law and statutory violations of his right to publicity against a documentary film maker

18  who used old video footage, voice recordings, and pictures of the plaintiff in his film

19  about the history of surfing.  Id. at 540.  The plaintiff had been a "legendary figure in

20  surfing" riding the waves of Malibu some thirty years prior to the film.  Id.  The film

21  maker obtained video footage, photos and voice interviews of the plaintiff and used

22  them without authorization in this for-profit documentary film.  Id.

23          The court found that appropriation of the plaintiff's identity for this project was

24  not actionable because the movie was a matter of public interest.  Id. at 546.  The

25  court stated that

27          The program in question in this case is a documentary about a certain

28          time and place in California history and, indeed, in American legend.

24

1        The people who were a part of that era contributed, willingly or

2        unwillingly, to the development of a life-style that has become world-

3        famous and celebrated in popular culture.  Although any one of them

4        as individuals may not have had a particular influence on our time, as

5        a group they had great impact.  This is the point of the program, and it

6        seems a fair comment on real life events "which have caught the

7        popular imagination."

8   Id. at 543.  Furthermore, the court found that matters in the public interest are "not

9   restricted to current events; magazines and books and radio and televison may

10   legitimately inform and entertain the public with the reproduction of past events,

11   travelogues and biographies."  Id. at 542 (internal quotations and citations omitted).

12   The Court commented that, "[a]s stated in Carlisle, a person may by his or her own

13   activities or by the force of circumstances  become a public personage and thereby

14   relinquish a part of their right of privacy 'to the extent that the public has a legitimate

15   interest in his [or her] doings, affairs or character.'"  Id., at 543-44 (citations omitted).

16   Finally, the Court observed:

17        Public affairs must be related to real-life occurrences. As has been

18        established in the cases involving common law privacy and

19        appropriation, the public is interested in and constitutionally entitled to

20        know about things, people, and events that affect it. For that reason, we

21        cannot limit the term "public affairs" to topics that might be covered on

22        public television or public radio. To do so would be to jeopardize

23        society's right to know, because publishers and broadcasters could be

24        sued for use of name and likeness in documentaries on subjects that do

25        not relate to politics or public policy, and may not even be important, but

26        are of interest.

27   Id. at 545-46.

28

1      The second case to apply the public interest exception, <u>Montana v. San Jose</u>

2   <u>Mercury News, Inc.</u>, 34 Cal. App. 4th 790, 793 (1995), reveals the breadth of the <u>Dora</u>

3   holding.  In <u>Montana</u>, the court found a public interest exception to the right of publicity

4   where a defendant newspaper used old photos to create posters of the famous

5   football star Joe Montana detailing his team's unprecedented four Super Bowl

6   championships in a single decade.  <u>Id.</u> at 793-94.  Despite the fact that the defendant

7   was clearly commercially profiting off of the posters and that Montana had not

8   consented to the use of his name or photo, the court found that "Montana's name and

9   likeness appeared in the posters . . . because [he] was a major player in

10  contemporaneous newsworthy sports events," and as such the use constituted a

11  public interest exception.[8]  <u>Id.</u> at 794.

12     Like the uses in <u>Dora</u> and <u>Montana</u>, Plaintiff's Album uses old recordings and

13  photos to put an historical perspective on a band (for which Rose was the lead singer)

14  which holds a prominent place in a sector of popular culture, namely early 80's rock 'n

15  roll music.  There is no doubt that GNR has become "world-famous and celebrated in

16  popular culture."  <u>Dora</u>, 15 Cal. App. 4th at 543.  In fact, Defendants acknowledge that

17  GNR "is one of the most prominent and popular musical groups of the 1980's." (Mot.

18  for Prelim. Injunction at 1).  As the lead singer in that band, Axl Rose became a very

19  high-profile public personage who, for that reason, relinquished to some extent his

20  right of privacy, which includes his right of publicity.  <u>Dora</u>, 15 Cal. App. 4th, at 543-44.

21  _____

22  [8] In <u>Solano v. Playgirl, Inc.</u>, the Ninth Circuit also recognized that the public interest exception
    should be broadly construed but held that it does not necessarily apply in cases where the public
23  figure has been deliberately portrayed in a false light.  292 F.3d 1078, 1089 (2002).  In <u>Solano</u>
    the plaintiff sued for violation of his right of publicity when Playgirl published photos of him on
24  the cover and inside the magazine.  <u>Id.</u> at 1081.  The court found that a material question of fact
    existed as to whether Playgirl used "plaintiff's name and likeness in a knowingly false manner"
25  by putting his photo next to language suggesting he had posed for nude photos for the
    magazine.  <u>Id.</u> at 1089.  The court found that because such malice would pull the work from
26  under the protection of the First Amendment, it was not clear that the work came under the
    public interest exception and thus consent was relevant to the right of publicity inquiry.  <u>Id.</u> Since
27  Rose does not, and indeed could not, claim that the use of his likeness in this case
    misrepresents anything about him, <u>Solano</u> supports the application of the public interest
28  exception on these facts.

1          Like the film in <u>Dora</u>, the Album educates its audience on the history of an era

2    surrounding a now legendary figure in popular culture.  For example, the first page of

3    the Album's four-page insert states that "[t]he early '80s was an exciting time to be a

4    part of the Hollywood, California rock music scene.  Punk Rock was peaking in the live

5    clubs and . . . [r]ockers far and wide loaded up their guitars and Marshall stacks and

6    headed for the West Coast to claim their fame and fortune on the Sunset Strip."

7    (Cohen Decl., Ex. C).  The back cover of the Album also states that "no other decade

8    in the history of civilization symbolized the glamorous, sleazy, over-the-top party rock

9    lifestyle like the 1980s!  No band on earth represents said excess better than the

10   legendary Guns N' Roses."  (<u>Id.</u>).  This extensive background and context is certainly

11   greater than that used in the posters of Joe Montana.  Thus, the Court finds that use

12   of Rose's identity in the Album is not actionable because like the surfing documentary

13   in <u>Dora</u> and the football posters in <u>Montana</u>, the use qualifies as a public interest

14   exception to the right of publicity.

15          Defendants launch two main attacks against this analysis.  First, they claim

16   that the Album is not entitled to protection as "newsworthy."[9]  (Opp. at 10).  However,

17   the public interest exception is separate from the newsworthiness exception

18   applicable to the public disclosure of private facts, and thus the Album need not meet

19   the multi-factor test for the newsworthiness exception.  <u>Dora</u>, 15 Cal. App. 4th at

20   543.[10]

21

22

23

---

[9] Defendants also assert that Plaintiff's work does not add significant creative elements so as
24   to transform it into something more than a mere celebrity imitation and entitle it to First
Amendment protection.  However, the public interest exception in no way depends on Plaintiff's
25   changing the original recordings or photos but instead only requires that they be of public
interest.
26

[10] The Court notes, as the Court did in <u>Dora,</u> that even if the newsworthiness test were applied,
27   it would be met in this case.  The Album has social value, the intrusion into Rose's private life
is minimal, and it would be an extreme understatement to say that Rose voluntarily acceded to
28   a position of public prominence.

Second, Defendants assert in their opposition (and at greater length in oral argument) that the public interest exception should not apply in this case because otherwise unauthorized footage of any famous persons could be used by others for profit and there would be no protection for their right of publicity. (Opp. at 10). This argument both overstates the exception and overlooks the fact that while California giveth, it can also taketh away.

Contrary to Defendants' assertions, the public interest exception does not entirely swallow the rule. Plaintiff is not simply bootlegging recent GNR songs or concerts and releasing them in competition with Defendants; it is providing recordings of a pre-GNR band some twenty years after their making in an effort to provide historical context to GNR, a famous band holding a unique place in popular culture. This use of Rose's identity for an historical look at the roots of a legendary figure in popular culture constitutes a specific exception to the right of publicity carved out by the legislature and applied by the courts.

Further, as the entire right of publicity was created by these two branches of California government, it can also be curtailed by them. The duty of this Court in deciding the case before it by supplemental jurisdiction is to apply California law, not to overrule California precedent or act against the will of the legislature. See Trident Center v. Connecticut General Life Ins. Co., 847 F.2d 564, 569-70 (9th Cir. 1988) (speaking of its duty to apply California precedent in diversity cases, the Court stated that even though "[i]t may not be a wise rule we are applying, . . . it is a rule that binds us."). Accordingly, the Court finds that the Album comes under the public interest exception to the right of publicity and Plaintiff is therefore entitled to summary judgment on this issue.

### c. Defendant's Reliance on McCarthy's Treatise is Misplaced

Unwilling to concede that the existence of a public interest in the published material negates the consent element of a right of publicity claim, Defendants point

the Court to a lengthy section of McCarthy, The Rights of Publicity and Privacy, which explains that consent as to one type of use does not transfer to all conceivable uses. (Opp. at 12).  The argument is beside the point.

First, the Court notes that this section of McCarthy deals not with the public interest exception or even the right of publicity in particular but rather discusses generally the scope of consent in the greater context of right to privacy actions.  See J. Thomas McCarthy, The Rights of Publicity and Privacy, § 10.21-10.24 (2d ed. 2003).  Second, McCarthy's analysis in pertinent part is inconsistent with controlling California law on the topic.  For example, McCarthy asserts that "consent to having one's photograph taken for the purpose of illustrating a news story is not a consent to having the same photograph used to illustrate a commercial advertisement."  Id. (internal citations omitted).

However, as the Court has clearly noted in its discussion of the public interest defense, California courts have in fact allowed a "photograph taken for the purpose of illustrating a news story . . . [to be] used to illustrate a commercial advertisement" where the later use falls within the public interest defense to a right of publicity action. See Montana v. San Jose Mercury News, Inc., 34 Cal. App. 4th 790, 793 (1995) (finding that a public interest exception applied to the defendant's use of pictures of Joe Montana, originally taken for a news story, which were turned into posters and sold for profit by the newspaper).  Thus, nothing in the treatise persuades the Court that controlling California precedent should be ignored in this case.

## G. INJUNCTIVE RELIEF

"The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law."  Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996) (citations omitted).  Plaintiff requests a permanent injunction preventing

1     any defendants, and their successors, heirs, and assigns, and the

2     agents, servants, and attorneys of any of these persons or entities, or

3     any and all persons in active concert or participation with or under

4     authority from defendants, either separately or jointly, from threatening

5     (or actually instituting) any suit or other proceeding against Cleopatra

6     or it distributors, or any of their officers, directors, agents, employees,

7     or servants, or in any other way interfering or threatening to interfere

8     with their lawful exploitation of the recordings, and their rightful and

9     truthful disclosure of biographical information concerning defendants.

10   (Compl. at 10).

11        Plaintiff cites no authority to support its request for the injunction but claims

12   that it is necessary because "[w]ithout injunctive relief, Cleopatra is vulnerable to

13   further interference by counterclaimants, either in the form of litigation or threats to

14   Cleopatra's licensees and distributors" and because the "remedy at law, damages, is

15   insufficient." (Mot. at 18).

16

17        The Court finds that injunctive relief in this case is both unnecessary and

18   inappropriate. First, Plaintiff is not vulnerable to suit with regard to the issues decided

19   by the Court in this order as res judicata would bar such actions. Thus, injunctive

20   relief is unnecessary. Second, to the extent that the request for injunction goes

21   beyond these rulings, the Court finds that such broad relief is unwarranted especially

22   considering that Defendants still have counterclaims pending concerning Plaintiff's

23   "exploitation of the recordings." Accordingly, the Court **DENIES** Plaintiff's request for

24   permanent injunctive relief.

25   //

26   //

27

28

## IV.

## CONCLUSION

For the forgoing reasons the Court **GRANTS** Plaintiff's motion for summary judgment on each of its claims for declaratory relief but **DENIES** Plaintiff's request for a permanent injunction.  Further, pursuant to Rule 56(f), the Court **DENIES** the motion without prejudice with respect to Defendants' counterclaims.

The matter is set for a scheduling conference on December 6, 2004, at 1:30 p.m.

IT IS SO ORDERED.

DATED:  November 22, 2004

Judge Gary Allen Feess
United States District Court

31